[No. 2826.]

A. E. Taylor *v.* The State.

1. Practice—Continuance—Transcript.—Where the ruling of the court refusing a continuance is relied upon as error, the application for the continuance should appear in the record on appeal, accompanied by or included in a proper bill of exceptions. Otherwise this court cannot determine the merits of such application.

2. Special Venire—Organization of the Jury in a Capital Case.—Article 605 of the Code of Criminal Procedure provides that, in capital cases, a special *venire* shall issue for not less than thirty-six nor more than sixty persons, to serve as jurors; and Article 614 of the same Code provides that the officer executing this writ shall, in his return, state the names of those summoned, and the diligence used to execute the writ upon those not summoned, and the cause of failure to summon them. Upon this return it is made by Article 616 the duty of the clerk to make a certified copy of the list of persons summoned under the writ, and issue a writ commanding the sheriff to deliver such certified copy to the defendant. Article 612 of the same Code provides that, "When from any cause there is a failure to select a jury from those who have been summoned upon the special *venire*, the court shall order the sheriff to summon any number of persons that it may deem advisable for the formation of the jury." *Held*, that under these provisions of the Code, it is no valid objection to proceeding with the trial in a capital case, that a less number than thirty-six of the persons named in the special *venire* have been summoned.

3. Murder—Evidence.—As tending to establish the motive of the accused in perpetrating the homicide, it was proper to admit in evidence, on behalf of the State, an indictment which was pending against the accused for an assault with intent to murder the deceased.

4. Same—Practice.—Verdict in a murder case found the accused guilty of murder in the first degree, and assessed his punishment at ninety-nine years in the penitentiary. *Held*, that the verdict being not only informal as to punishment, but contrary to the charge of the court, and not such a finding as the court could receive, it was not only proper but was the duty of the court to reject the verdict, call the attention of the jury to the charge, and send them out again to consider of their verdict.

5. Same.—It was within the power of the court to have a second verdict corrected, the jury consenting, by inserting the word "confinement" before the words "in the penitentiary for life." And *held* further, that the verdict was good without the insertion of the word "confinement."

6. Same.—The defendant in a murder case being convicted in the first degree, with a life term in the penitentiary assessed against him as punishment, the court pronounced sentence against him after notice of appeal was given. *Held*, correct, and in strict compliance with the law.

7. SAME—CHARGE OF THE COURT.—In the absence of evidence tending to establish a lower degree of homicide, the charge of the court was properly confined to murder of the first degree.

8. SAME.—See the statement of the case for two special charges asked by the defense, and properly refused, because the one was clearly upon the weight of the evidence, and the other was clearly not the law.

9. SAME—FACT CASE.—See evidence held sufficient to sustain a conviction for murder in the first degree.

APPEAL from the District Court of Henderson. Tried below before H. G. Robertson, Esq., Special Judge.

The indictment in this case charged the appellant and A. J. Goodgame and Ben. McCall jointly with the murder of George Eldridge, in Henderson county, Texas, on the twentieth day of April, 1881. The appellant moved for a severance, and that his co-defendant McCall be first put upon his trial. The motion was sustained, whereupon the district attorney dismissed the prosecution as to Goodgame and McCall, and the trial of the defendant was proceeded with, resulting in his conviction of murder in the first degree, with a life term in the penitentiary assessed against him as punishment. His motion for new trial was overruled, and he prosecuted this appeal.

Louisa Eldridge, the widow of the deceased, was the first witness introduced by the State. She testified that she resided in Henderson county, about twelve miles from the town of Athens, and had lived there for twelve years. Her husband, the deceased, was murdered near their home on the twentieth day of April, 1881. The deceased told the witness early that morning that he had to go to Athens to attend court as a witness for the State in a prosecution against the defendant for shooting at him, deceased. The witness heard the reports of the gun at the time the deceased was shot. She went immediately in the direction of the place from whence the reports proceeded, and found the deceased, shot in the left side and in the small of the back. He did not speak to the witness, but died within a few minutes after she reached him. The mule ridden by the deceased, and on which he had started to Athens, was standing on the farther side of a dug-out, or wash in the road, which was about three hundred yards from his, deceased's, house. His hat and sack of provisions were lying in the road near the dug-out, and both were stained with blood. The witness found her husband lying just over and inside the fence. The witness heard the deceased scream when the gun fired.

Cross-examined, the witness stated that the shooting occurred about daylight. The witness was sitting up in bed when it occurred, and there was no one other than her children about the place at the time. Elizabeth, the elder of the children, about fifteen years old, was absent at time of this trial, and, in fact, had been about that section of the country but once since the deceased was killed. She, Elizabeth, testified in a former proceeding in this case. The deceased was killed about three hundred yards from his house. The witness understood and appreciated the obligation of an oath. The result of false swearing would be the penitentiary first, and hell afterwards. It was light enough to see when the deceased started to Athens on the morning of his death. He remarked, as he started, that he did not know whether he could get to Athens by eight o'clock or not, but would try. This all occurred in Henderson county.

Doctor G. Malcolm was the next witness for the State. He testified that he could claim no personal acquaintance with the defendant, but knew him by sight, and knew that, at the time of the killing of deceased, he lived with his mother, Mrs. Hodge, six or seven miles from where the deceased lived, and about five miles from Athens. Deceased lived about thirteen miles from Athens. Witness lived about one thousand yards distant from the house of the deceased. The witness was awakened by his son about daylight on the morning of the shooting, and was told that there had been two discharges of a heavy gun in the direction of Eldridge's house. Witness heard screams, and, dressing, went towards Eldridge's house, and found the deceased lying in his field near the road. He was wounded in three places, according to the recollection of the witness, one penetrating the heart. The heart made one or two pulsations after the witness reached the body.

The witness went to Mr. John A. Goodgame's house to secure his services in holding an inquest over the body, but Goodgame was in Athens. On his way to Athens the witness discovered the tracks of two horses, at one place going from the direction of Athens, and in another place going towards Athens. The condition of the tracks showed that the horses traveled in a run. These tracks led from the road towards Mrs. Hodge's house, and showed, also, that they had come from Mrs. Hodge's house to the road. One of the tracks came out from Mrs. Hodge's place and went to Athens. This track the witness followed to the horse rack in Athens. The witness bought the material for

the shroud in Athens, and took it back to the body of the deceased.

The witness examined the ground about where the shooting was done, and, from the tracks of men around, concluded that three parties were present at the time of the shooting. He discovered a point from which a shot was fired, behind a post oak tree about thirty feet from the road. He found, also, the tracks of three men following the mule of the deceased to the gully, at which point the tracks divided, two going in one direction and the third into the woods. The witness did not see the third track any further than this point of separation. The witness tracked the deceased to the fence, and found blood on the fence. He found, also, where a load of buck shot was imbedded in the fence. He found a point in the woods, about one hundred and fifty yards from the road, where a horse had been hitched. He identified the horse track at the place of the killing with the horse track he saw coming out of Mrs. Hodge's place, and which he trailed to the horse rack in Athens. This track was about three feet from where the mule of the deceased seemed to first start to the place where the party shooting stood behind the tree.

The defendant was the second man whom the witness saw in Athens when he arrived in town on that morning. District Court was then in session. Witness did not see the defendant on the horse which he, witness, tracked to the horse rack in Athens. The witness examined the tracks of some men starting from a tree about one hundred yards distant from the house of Eldridge, and compared them with the tracks following the deceased's mule, and found them identical. Two of these different tracks turned across the field within sixty yards of where the deceased was living.

Cross-examined, the witness stated that there was but little travel over the road on which the deceased was killed. That was not a public, but was a private or neighborhood road. It was occasionally, though seldom, traveled. The witness had often seen where horses had run on other roads. The witness did not actually see the men on the horses, whose tracks he described, kill the deceased, and could not, of course, say positively that the deceased was killed by the men who rode those horses. Several freedmen, some seven or eight, were at the house of the deceased when the witness arrived there. It was after he returned from Athens, or about twelve o'clock, that the witness examined the tracks of the men. There were, at the

place of the killing, the tracks of two men and the tracks of two horses. The house of Mrs. Hodge, where the defendant lived, is about five·miles from Athens, nearly on, or rather set back a short distance from, the road which leads to Eldridge's house, seven miles beyond. Witness had never studied atmospheric influences upon horse tracks, but did not think that an intelligent man could be mistaken about the time a horse track was made, if it was but two or three hours old. It was cloudy on the morning of the killing. As usual, the gulf clouds were low on that morning. A great deal of rain fell in that neighborhood during the month of April, 1881. Witness, who was a physician of twenty-eight years' practice, was one of the jury·of inquest.

The witness stated that he did not think that he stated on the *habeas corpus* trial that he refused to testify as an expert, because he was offered no compensation. Such was not in fact his reason for declining to testify as an expert. His real reason was that he never liked to appear in court as a witness. He did not like to be "badgered" by lawyers. The deceased was lying on his back when the witness saw him, but it may be that some one had turned him over. The deceased was stripped down, and on his person three wounds were found, the holes being about the size of those made by "blue whistlers." There are not a great many people living in the immediate neighborhood of the house of the deceased. There are several, however, within a radius of five or six miles, including the families of Jackson, Taylor, Tinkle, Allen and Mrs. McCall. There were quite a number of horses in the neighborhood, and the witness supposed that two horses could be found that would make tracks similar to those found by the witness about the place of killing. A peculiarity about the tracks of one of these horses was a way he had of "digging out" with his feet. The horse track coming out of Mrs. Hodge's place was the same as one of the tracks at the place of the killing. Witness could not tell the size of the horses by the size of the tracks. A general but uncertain rule is that the horse and his track correspond in size.

Sheriff William Davis testified, for the State, that he frequently heard of the presence of the defendant in the neighborhood of Mrs. Hodge's after his escape from the Tyler jail, but he could never find him. Witness made effort to secure the recapture of the defendant after his escape, but always failed.

He was finally arrested in Louisiana and brought back under requisition, and delivered to the witness.

Peter Scott, ex-justice of the peace of Willow Springs beat, testified, for the State, that he had known the defendant ever since he was a very small boy, and knew the deceased for the two or three years preceding his death. The witness was at the inquest over the body of the deceased, but did not see the defendant there. He saw the defendant in Athens that day, and remembered that he, defendant, was taken to Tyler, from the jail at which point he afterwards escaped. The witness saw the defendant after his escape from the Tyler jail. He came to the house of the witness, alone, and the witness and he had a conversation. The defendant came to the house of the witness about noon and called the witness to the gate, and said that he ad come to tell the witness about the killing of the deceased. He had a pistol of some kind with him at the time.

At that time and at the gate, the defendant told the witness that he, defendant, was the man who killed the deceased; that no one else could be implicated with him, for he was alone. He told the witness that he went to the neighborhood of the deceased's house the day before the killing, before dark, but failed of an opportunity to kill the deceased. He went back before day, alone, and got behind a tree near the road side, and when the deceased came in range he shot him from behind the tree; that the mule ran some distance, and the old negro, the deceased, fell from the mule, or dismounted, and ran towards the fence, and that he, defendant, shot the deceased again. Defendant said there were not three men at the place when the deceased was killed—that no one was with him; that he killed the old negro because of a previous difficulty, and because the old negro had "carried a gun for him" and refused to desist when he, defendant, sent him word to put his gun up; and, further, because the old negro was going to swear a lie on him.

Cross-examined, the witness stated that he was not an officer when the conversation related transpired at his house. His impression was that McCall was at large at that time. He did not know whether Goodgame was at large or not. Defendant told the witness that he wanted people to know all about the killing, and the impression left upon the witness was that he wanted to remove the suspicions entertained by the public respecting the complicity of McCall and Goodgame. As to the time when this conversation occurred, the witness could not locate it, but was

of impression that it was during the year 1881; as to the place, it was at the witness's gate in Henderson county. The conver- sation occupied but a few minutes, after which the defendant rode off. Witness knew of no other business the defendant had with him at that time, though he said that he wanted to see Dr. Malcolm, and asked the witness to go with him to the doctor's house. From that time until this trial the witness had not seen the defendant.

Dictrict Clerk John Collins testified, for the State, that at the time of the death of the deceased there was a prosecution on the docket of the District Court pending against the defendant for an assault with intent to murder the deceased. It was first post- poned until Wednesday, which was the day of the killing, on ac- count of the absence of two witnesses, Pomp Goodgame and Ben. McCall, who were fined by the court. Here the State intro- duced the indictment in the case referred to, and the court docket, showing that the case was set for Wednesday, April 20, 1881, the day of the assassination.

M. T. Pace testified, for the State, that he lived eight miles southeast of Athens, and had lived in Henderson county for about ten years. He had known the defendant for four or five years. He remembered the day that Eldridge was killed. He was at Eldridge's house on that day. Defendant was not there. The witness had seen him twice since his escape from the Tyler jail, at his, witness's, field and on the road. The first time wit- ness saw him he remarked to the defendant that the deceased, George Eldridge, was a good negro. Defendant replied: "Yes, he was a good negro," and then told the witness about his es- cape from the Tyler jail. He said that a fellow whose name, he believed, was Ball, turned him out, and that he got out at a win- dow. He was then on the "scout." Goodgame escaped from jail at the same time that defendant did, and was at large when this conversation occurred. McCall was still in custody.

Dr. J. R. Blackabee testified that he knew the defendant, and knew the deceased in his lifetime, but had no intimate acquaint- ance with either of them. He saw the defendant after the kill- ing. This was some time in cotton picking time, during the fall or winter of 1881. The defendant rode up to the witness's house, and into his field, armed with a double barreled shot gun and some pistols. The defendant passed the compliments of the day, and after a time said that he wanted to tell the witness about the killing of the old negro George Eldridge; that some of

his friends had been charged with participation in the crime, and were confined in jail. Witness told him that he did not want to hear anything about it, and would prevent him from telling about it. Defendant replied that he wanted to tell the witness, and would tell him; that he killed the deceased, and had no accomplices, but laid and executed the plans himself; that he went to the house to kill the deceased before, but failed; that the first shot he fired at the deceased, on the morning of the killing, the gun hung fire, and he thought the negro shifted his position, and he did not succeed in killing him; that the negro ran, and he ran after him and shot him again as he was getting over a fence, and supposed that he killed the deceased, but that he did not go to see. He further told the witness that he watched the spring and horse lot at deceased's house on the night before, but failing to see the deceased, went home, reaching there about ten o'clock; that he got up next morning before day, and went back and hitched his horse in the woods near by; and that after he killed the deceased he rode back home, reaching there a little after daylight. He said that he met Ben. McCall at the lot, who remarked that his horse was sweating a great deal, and that, in reply to McCall, he said that he "guessed he had been riding him pretty hard."

Cross-examined, the witness said that he did not know, but that it was his impression, that McCall and Goodgame were in the jail at the time he had this conversation with the defendant. The defendant told the witness that he wanted McCall and Goodgame out of the trouble, and did not want them to suffer on his account. Witness remarked to him: "Young man, this is a very bad tale you tell; if it is told on you in court, it will break your neck." He replied: "Well, I am going to leave the country." He then bade the witness good-bye and rode off.

Mr. Owens testified, for the State, that he had known the defendant since he was a small boy. He did not know the deceased, but heard of his being killed. He saw the defendant after the killing of the negro. He came to the house of the witness one night in October or November, 1881, hailed at the palings, and the witness went out and asked what he wanted. He said that his name was Bud Taylor, and that he wanted to tell the witness about the killing of the deceased. He said that he did the killing; that McCall and Goodgame had nothing to do with it, were not there, but were at home at the time; that on the day before the killing he went to the spring, then to the house, and then to

the lot, and watched for the deceased, but failed to see him; that he went home and returned next morning before day, and shot the negro from the roadside; that his gun made a long fire at first, and he did not kill the deceased, but that he shot him the second time as he got over the fence, and judged from the noise deceased made that he killed him; that he then went home and met McCall in the lot, who remarked that his horse was sweating and "something must be up," to which he replied that he guessed he had ridden hard; that he then remounted and rode the horse to Athens.

The defendant told the witness that he killed the deceased because the deceased was mad with him, defendant, and with Bill Martin, and would not talk to them, and because the deceased was going to swear to a d—d lie on him; that the deceased was going to swear that he, defendant, shot him, deceased, twice, whereas he had shot the deceased but once. The witness told the defendant that if the account given by him, the defendant, was told in court it would break his neck. Witness, many years ago, was county judge of Henderson county.

Cross-examined, the witness stated that the defendant requested him to see and tell the lawyers employed by McCall and Goodgame what he told witness about the killing. Faulk and Martin were the attorneys for Goodgame and McCall. The understanding of the witness was that both Goodgame and McCall were in jail when this conversation occurred. At this point the State closed.

A. A. Faulk was the first witness for the defense. He testified that he saw the defendant in Athens on the day before the deceased was killed. He saw him again after night; saw him frequently that day, off and on, from about noon until after night. He saw Pomp Goodgame in Athens up to about twelve o'clock on that night. The defendant was in Athens attending court, as defendant to a prosecution for assaulting the deceased.

George DeMoville was the next witness for the defense. He testified that he lived with the defendant in April, 1881, at the house of his mother, Mrs. Hodge. Witness remembered the death of George Eldridge on the twentieth day of April, 1881. Witness was at Mrs. Hodge's the morning before. The defendant was there that night and the next morning. The witness got up that morning about day. The defendant was not then in his bed, nor did the witness know that he saw the defendant in his bed at all. He did not know what time it was when the

defendant got home the night before, but thought that it was about ten o'clock. The defendant fed his horses that morning when he got up. Witness saw the defendant putting on his clothes before or just as he, witness, started for water. It was about three miles from Mrs. Hodge's to Eldridge's house. The witness and two or three others went to Athens together that morning, and first heard of the killing in Athens.

Cross-examined, the witness said that he did not see the defendant when he went to bed on the night before the killing; did not see him in bed, nor did he see him when he got up. It may have been quite light when the witness got up. He did not remember where he first saw the defendant next morning. The witness had been asleep when the defendant got home on the night before the killing. The witness slept with a party named Leopard, and supposed that the defendant slept with McCall. Witness did not see the defendant when he first got up, but saw him going to the lot as he, witness, was returning to the house with water. Witness did not notice that any of the horses were sweating. The defendant went to Athens on that morning ahead of the witness and his party. Witness saw him in town, but did not know where he hitched his horse. Charley Leopard was in the house when the witness got up on the morning in question, and got up about the same time.

The defendant was not at home during the day on the day before the killing. The first thing the witness did upon getting up on Wednesday morning was to make a fire, and the next thing was to bring water from a well about one hundred and fifty yards distant. When the witness got up he saw no one in the room but Ben. McCall, and saw no one else up. The defendant came home, on the night before the killing, before McCall got home. Witness had no conversation with defendant that night. He did not see the defendant go to bed at all. Witness may have been asleep. He did not see the defendant put his clothes on on the morning of the killing. He did not say on this examination that he did see the defendant putting on his clothes when he, witness, came back to the house with water. When the witness first saw defendant that morning, the defendant was on his way to the lot. Witness had no particular business in Athens on that day, was not asked by defendant to go there, and was not attending court.

Re-examined, the witness said: "Defendant slept with Ben. McCall. I don't know that I noticed next morning whether he

was in bed or not. The first time I saw him was as I came from the well. I heard him when he came in the night before. I went to sleep directly after he came."

Charley Leopard testified that he lived with Dan. Coleman when Eldridge was killed, but that he spent the night before the killing at the house of the defendant. He saw the defendant there the night before and on the morning of the killing. The first that the witness saw of the defendant next morning was after sun up, out in his lot. The witness and George DeMoville went to Athens that day. John A. Goodgame, Pomp Goodgame, Ben. McCall and the defendant, all went to town that day.

Cross-examined, the witness reiterated that it was at the lot he first saw the defendant on the morning of the killing. He saw the defendant when he went to bed on the night before, but did not remember that the defendant did or did not strike a light. The defendant was at home on Tuesday evening before the killing, and helped the witness mark some pigs.

The special charges asked by the defendant and refused, and which form the subject of one of the rulings of this court, read as follows:

First. "The defendant asks the following special charge: The jury are charged that in considering the confessions of defendant, you will consider the motive with which they were made, if any such motive is shown other than a deliberate confession of his own guilty acts; and that such confessions are to be received and weighed by the jury with caution in making up their verdict."

Second. "Defendant asks the following special charge: The jury are charged that before they convict the defendant in this case, the evidence must show to their satisfaction that the deceased was shot and killed with a double barreled shot gun."

The motion for new trial raised the question involved in the opinion.

No briefs for the appellant have reached the Reporters.

*J. H. Burts*, Assistant Attorney General, for the State.

Willson, Judge. 1. If there was any error committed in overruling the defendant's application for a continuance, it has not been made apparent to us by the record. We find in the record a bill of exception taken to the action of the court in

overruling defendant's application for a continuance, but the application itself does not appear in the record, nor are its contents or substance stated in the bill of exceptions. We cannot, of course, determine the merits of such an application without being informed of the grounds therein set forth. Where the ruling of the court refusing a continuance is relied upon as error, the application for the continuance should appear in the record on appeal, accompanied by or included in a proper bill of exception.

2. There was no error in the action of the court in regard to the *venire* and the formation of the jury. A special *venire* issued for sixty persons to serve as jurors. Less than thirty-six of those persons were summoned and in attendance. It is not required by the law that as many as thirty-six of the special *venire* shall be summoned and in attendance, before the defendant can be put upon his trial. It is provided that a special *venire* shall issue for not less than thirty-six nor more than sixty persons, to serve as jurors. (Code Crim. Proc., Art. 605.) And that the officer executing this writ shall in his return thereof state the names of those summoned, and state the diligence that has been used to execute the writ upon those not summoned, and the cause of failure to summon them. (Code Crim. Proc., Art. 614.) Upon this return it is made the duty of the clerk to make a certified copy of the list of names of persons *summoned* under the writ, and issue a writ commanding the sheriff to deliver such certified copy to the defendant. (Code Crim. Proc., Art. 616.) It is then provided that, "When from any cause there is a failure to select a jury from those who have been summoned upon the special *venire,* the court shall order the sheriff to summon any number of persons that it may deem advisable for the formation of the jury." (Code Crim. Proc., Art. 612.) It is quite clear to our minds from these provisions that it is no valid objection to proceeding with the trial, that a less number than thirty-six persons named in the special *venire* have been summoned. (*Harris* v. *The State,* 6 Texas Ct. App., 97.)

3. It was not error to admit in evidence the indictment pending against defendant for an assault with intent to murder the deceased. It was clearly admissible as evidence tending to establish a motive on the part of the defendant impelling him to the murder of the deceased. (*Rucker* v. *The State,* 7 Texas Ct. App., 549, and other cases there cited.)

4. We think the action of the court in refusing to receive the

first verdict returned by the jury was correct. This verdict found the defendant guilty of murder in the first degree, and assessed the punishment at confinement in the penitentiary for ninety-nine years. It was not only an informal verdict as to the punishment, but it was contrary to the charge of the court, and was not such a finding as the court could receive. It was not only proper, but it was the court's duty, to refuse to receive the verdict, and to call the attention of the jury to the charge of the court, and send them out again to consider of their verdict. (Code Crim. Proc., Arts. 712–715; *Alston* v. *The State*, 41 Texas, 39; *Jones* v. *The State*, 7 Texas Ct. App., 103.) So, also, it was within the power of the court to have the second verdict corrected, the jury consenting thereto, by inserting the word "confinement" before the words "in the penitentiary for life;" though we think this was unnecessary, as in our opinion the verdict was good without the insertion of the word "confinement." (*Jones* v. *The State*, 7 Texas Ct. App., 103; *Gage* v. *The State*, 9 Texas Ct. App., 259.)

5. It was not error for the court to pronounce sentence upon the defendant after he had given notice of appeal. Sentence was necessary before his appeal could be taken, and an appeal to this court without sentence would have been dismissed. This action of the court was in strict compliance with the law. (Code Crim. Proc., Art. 794; *Hart* v. *The State, ante*, p. 323.)

6. We find no error in the charge of the court. It was properly confined to murder in the first degree. There was no evidence which would have justified a charge upon any lower degree of homicide. Nor was there any error in refusing the two special instructions requested by appellant, as one was clearly a charge upon the weight of evidence and the other was not the law.

We have noticed all the objections of the appellant presented by the record, and have found none of them tenable. That the evidence amply supports the finding of the jury there can be no doubt. Defendant, in addition to strong circumstantial evidence against him, confessed to several persons that he had committed the homicide under circumstances that made it nothing less than murder in the first degree. That his life has been spared by the verdict of the jury can only be attributed to the benign influence of mercy, and not to any mitigating facts attending the deliberate and cowardly assassination. The judgment is affirmed.

*Affirmed.*

Opinion delivered June 6, 1883.